SAMUEL N. LEVY et al., Suing on Behalf of Themselves and All Other Stockholders of the AMERICAN BEVERAGE CORPORATION Similarly Situated, Respondents, v. AMERICAN BEVERAGE CORPORATION, Appellant-Respondent, Impleaded with IRVING FEINBERG et al., Defendants, and EDWIN C. McCULLOUGH et al., Defendants-Appellants.

First Department, December 11, 1942.

*Jeremiah T. Mahoney* of counsel (*Nathan April* and *Harry G.* *Kosch* with him on the brief; *Phillips, Mahoney & Fielding,* attorneys), for appellants.

*Almet R. Latson, Jr.,* of counsel (*Latson & Tamblyn,* attorneys), for defendant-appellant-respondent.

*Max J. Rubin* of counsel (*Morris Gottlieb* with him on the brief; *Karelsen, Karelsen & Rubin,* attorneys), for intervenors-plaintiffs-respondents. *Glatzer & Glatzer,* attorneys for plaintiff Clinton A. Hagenbuch et al. *Abraham N. Geller,* attorney for plaintiff Oscar Friedlander. *Manuel Tancer* and *Abraham N. Glickman,* attorneys for plaintiff Samuel N. Levy. *Geist & Netter,* attorneys for plaintiff Meyer Friedenson.

CALLAHAN, J. The defendants-appellants, former owners of a majority of the voting stock of American Beverage Corporation, have been held liable for financial losses sustained by that corporation. All of these losses occurred after appellants

ceased their connection with the company, and were due to the misconduct or mismanagement of persons to whom said appellants sold their corporate stock.

In addition, appellants have been compelled to pay over to American Beverage Corporation an alleged profit in the sum of $169,000, which it has been found was illicitly made by them on the sale of their stock, although in fact they sold it for less than they paid for it.

The theory on which this drastic judgment rests is that appellants held controlling stock interest in the American Beverage Corporation and that by reason of such control they owed the duty of fiduciaries to the corporation, and to the minority stockholders thereof; that, as such fiduciaries, they were bound to make proper investigation of the moral and financial responsibility of the purchasers of the stock, as well as to the source of the funds used to acquire the stock. Breach of these duties was found here, based on the holding of the trial court that circumstances had occurred in connection with the sale conveying knowledge or notice to the sellers that the purchasers were morally and financially irresponsible, that they planned to use the credit of American Beverage Corporation to secure the funds to pay for the stock; and that they intended to mismanage the company, and to convert its assets to their own use.

We find that the evidence adduced upon the trial did not warrant the inferences drawn by the trial court from the facts established, and that an erroneous rule of law was applied in fixing the duty and liability of the appellants.

Plaintiffs, who were minority stockholders suing in a representative capacity, attempted to prove their contentions largely from testimony extracted from defendants and other persons connected with the sale of the stock. There is no doubt from the proof that sale of stock control of American Beverage Corporation by appellants resulted disastrously to American Beverage Corporation. Nor is there any doubt that the purchasers used fraudulent methods which, in effect, used the funds of American Beverage Corporation to reimburse themselves for the purchase price of the stock acquired. The real issue here was whether appellants by reason of any dereliction of duty on their part are to be charged with liability for the misconduct of the purchasers.

A statement of the essential facts is necessary in order to point out the errors which require reversal.

Appellant, Edwin C. McCullough, was president and director of American Beverage Corporation, placed there by a board of directors selected by him through control of fifty-three per centum of the voting stock of the corporation. This controlling stock was owned by The McCullough Corporation, co-defendant, the stock of which, in turn, was owned by members of the family of Edwin C. McCullough. McCullough was president, and in active charge of the affairs of both corporations. He was entrusted with the voting rights of the stock, and took entire charge of the sale of said stock. Under the circumstances we shall treat the liability of both appellants as the same, without attempting to make any nice distinctions as to their obligations.

Edwin C. McCullough had been the directing spirit of American Beverage Corporation for several years prior to the occurrences herein. Under his guidance the corporation which dealt in soft drinks, and later in wines and liquors, had been built up into a sound and prosperous concern. He had selected as fellow directors men of large business interests. One of them was Theodore W. Stemmler, an investment banker. Another was Benjamin B. Avery, who was attorney for and secretary of the corporation. The appellants owned approximately 72,000 shares of the common stock, which had a par value of one dollar. As heretofore stated, the 72,000 shares represented fifty-three per centum of the voting stock. This stock had cost The McCullough Corporation upwards of $400,000, or about $5.60 a share. The stock was listed on the New York Curb Exchange, but was inactive. At the time of the sale involved it had a book value of about $4.31 a share, and the books were kept on a very conservative basis. The common stock, however, sold on the exchange at very much less than the book, or liquidating, value, and at times as low as one and one-eighth a share.

American Beverage Corporation occupied a plant in New York city which was owned by a corporation controlled by the McCullough family. A very favorable long term lease was held by the landlord.

In June or July, 1938, through Stemmler, a proposal was made by defendant, Irving Feinberg, to merge a company, known as Prendergast-Davies Co. Ltd., controlled by him, which was in the wine and liquor business, with American Beverage Corporation. Edwin C. McCullough rejected this proposition, but offered to buy the assets of Prendergast-Davies Co. Ltd., if their existence and value as stated on a balance sheet shown to him could be verified. That balance sheet showed Prendergast-Davies Co.

Ltd., had net assets of $120,000. The deal fell through when Feinberg insisted on receiving a contract of employment with American Beverage Corporation. McCullough admitted that he knew that Prendergast-Davies Co. Ltd., had at one time been controlled by a man connected with the illegal sale of liquor, and that Feinberg had bought control from that man.

In October, or November, 1938, again through Stemmler, one H. Vaughan Clark, a Philadelphia banker, apparently of good repute, proposed merging American Beverage Corporation with a distillery controlled by him. Clark told a rather convincing tale of his intention to merge a number of beverage and liquor companies into a larger company. McCullough would have nothing to do with this merger, but offered to sell his 72,000 shares of stock for cash. After considerable negotiations, an option was given by McCullough to Clark, in which Stemmler was nominated as the buyer, whereby the 72,000 shares were to be sold for $250,000, or approximately $3.50 a share. This option expired on December 16, 1938. On December 15, Clark advised McCullough that he could not close the deal, and desired a further option of thirty days. When Clark agreed to pay $10,000 for this further option, McCullough consented. Thereupon a lawyer, George J. Mintzer, appeared on the scene, and it was made known that Prendergast-Davies Co. Ltd. and Feinberg were interested in the deal for acquiring the stock. The $10,000 was produced by Mintzer, and the second option ran to Feinberg. Statements continued to be made, however, as to the larger merger. In fact it was stated that Feinberg was to be employed as selling agent of the new company in New York.

This second option was to expire on January 14, 1939. The regular annual meeting of stockholders of American Beverage Corporation was set for January 17, 1939. On January 7, 1939, in accordance with a custom of long standing, requests for proxies were sent out to minority stockholders, which, in substance, stated that the old board of directors would be continued. The second option was exercised on January 14, 1939, the sale was consummated, and a proxy given to Feinberg to vote the 72,000 shares being sold by the McCulloughs. The propriety of notifying the minority stockholders of the change in control was discussed among the McCulloughs, Avery, and others. A letter of notification was prepared, but never sent, Avery advising that insufficient time existed for these letters to reach stockholders so as to be of any avail before the meeting. However, an account of the change in control of American Beverage Cor-

poration was published in the newspapers of January 18, 1939. A new board of directors nominated by Feinberg was elected at the meeting of January 17. That board included Clark. Stemmler, though not elected in January, was re-elected to the Board in March, 1939, in place of Clark. The proxies received from minority stockholders were voted for the old board in accordance with the statements contained in the letter soliciting them. No proof was adduced to show that McCullough knew, even at that time, that the larger merger which had been discussed was not to go through. From the 14th of January, 1939, McCullough was actually out of control of American Beverage Corporation, although he received his salary for the balance of the month of January. On January 18, under Feinberg's direction, an agreement was entered into whereby Prendergast-Davies Co. Ltd. sold its assets (other than its 72,000 shares of American Beverage Corporation stock) to American Beverage Corporation, and, in return, American Beverage Corporation assumed the debts and liabilities of Prendergast-Davies Co. Ltd. Almost immediately after this agreement was signed, drafts totaling $115,000 were drawn at Feinberg's direction on the bank account of American Beverage Corporation to pay merchandise creditors of Prendergast-Davies Co. Ltd. McCullough happened to be in the office at the time these drafts were drawn, and the treasurer, who had been asked to sign the checks, told McCullough of the transaction. His response was to the effect that the treasurer should be careful that he was not doing anything criminal. As all transactions after January 14th occurred under Feinberg's directions, and at a time when McCullough was no longer in control, it would be improper to ascribe liability to appellants for anything occurring after that date, unless they were occasioned by some misconduct occurring before the date of sale. Many things occurred after Feinberg obtained control which contributed to the financial difficulties of American Beverage Corporation. Among these were the cutting off of credit by banks from which American Beverage Corporation had previously obtained commercial loans, the cancellation of the basic liquor permit held by American Beverage Corporation, market conditions in the sale of beverages, and financial difficulties of subsidiary companies controlled by Feinberg, the stock of which companies had been used by Feinberg in connection with the completion of the merger.

The trial court found, on the facts above outlined, that McCullough had been placed on notice of the moral and financial irresponsibility of the purchasers of the stock, and the financial

insecurity of Prendergast-Davies Co. Ltd., of the intention to merge and to loot American Beverage Corporation, and then held them [appellants] liable for events which occurred after January 14th. In substance, the trial court found fraud, lack of good faith, and negligence on the part of appellants. There was no basis in the record for any finding of actual fraud, and any finding of constructive fraud or of lack of good faith could only rest on the existence of a fiduciary relationship. The finding of negligence was likewise based on a conception that appellants' duties as controlling stockholders were those of a fiduciary. Upon the findings of fact the court concluded that appellants were liable to account for any profits, and to compensate American Beverage Corporation for all the acts of mismanagement after Feinberg obtained control. Upon the trial Feinberg was permitted to settle his liability on the basis of a reconveyance of the American Beverage Corporation stock so as to permit the reorganization of American Beverage Corporation.

Even if we were to assume for the moment that the court applied the proper rules of law as to the liability of controlling stockholders, under the present circumstances we would be compelled to make findings of fact different from those of the trial court, because, in our view, the inferences which the trial court drew from the facts proved are unwarranted. We fail to find any sufficient evidence of a warning to McCullough of a contemplated looting or how any investigation which McCullough could have made would have revealed the improper intentions and machinations of Feinberg. Undoubtedly the latter went to great length to hide from McCullough his real intentions by putting Clark into the forefront of the negotiations, and having Clark paint a picture of a new and larger company. The trial court stated in its opinion that there was no direct evidence that McCullough knew of Feinberg's intention to have American Beverage Corporation assume the liabilities of Prendergast-Davies Co. Ltd., and, thus, indirectly pay for the stock. The basis of the court's decision of breach of duty was that there were sufficient circumstances to put McCullough on guard as to Feinberg's wrongful intentions. To infer that McCullough was warned of an intention to loot American Beverage Corporation, and render it financially worthless, was to infer that he disregarded the effect that this would have had on the long and lucrative lease held by his family on the building occupied by American Beverage Corporation. If McCullough could have known of an intention to loot, then Stemmler was in even a better position to learn of this, yet Stemmler's family held considerable of

the preferred stock of American Beverage Corporation, which would have been rendered valueless. While McCullough received a price for the 72,000 shares in excess of the price at which small lots of the stock sold in the open market, he was receiving less than the book, or liquidating, value of the stock, and he knew the very conservative basis on which the books of American Beverage Corporation were kept.

We think that the evidence discloses that McCullough believed up to the time his stock was actually sold that a larger merger was intended. In fact the trial court indicated in its opinion that this intention of forming a larger corporation by merger of American Beverage Corporation with several other companies might have been abandoned after the sale. If the real intentions of Feinberg were unknown to McCullough, or if the latter had no substantial warning thereof or of the intention to abandon the larger merger, then the whole theory on which the trial court placed liability fails. That there was no disclosure of abandonment, if in fact such a plan ever existed, is evidenced by the actions of Feinberg in placing Clark on the new board of directors. Doing this would lead McCullough to believe in the continuation of the grandiose scheme. The existence of new interests would, of course, have led McCullough to believe that there were sources available for the payment of the purchase price of $250,000 other than the treasury of Prendergast-Davies Co. Ltd. We think that the test of common sense and sound business judgment applied to this transaction would show that McCullough had no warning that American Beverage Corporation was in danger of being looted. He had substantial financial reasons because of the existing lease for not desiring to see any such result accomplished.

Under the circumstances we must reverse the findings of fact made, and conclusions drawn, which are inconsistent with our views as to the notice conveyed to McCullough. In the absence of such findings, reversal of the judgment would necessarily follow. This is so, for in the absence of knowledge or notice there would be no basis for a holding that there was any breach of duty on McCullough's part or intention by him to act in hostility to the interests of American Beverage Corporation, or its minority stockholders. A holding that such a breach or intention to injure existed would be a prerequisite to any liability such as was imposed here. There was no evidence that McCullough conspired fraudulently to turn over control to a purchaser in order to enable him to loot the corporation. The trial court

found no such conspiracy. It placed liability on the existence of a fiduciary relationship and breach of duties imposed thereby.

We doubt that the status of one owning a controlling block of stock can be said to be that of a fiduciary as to the sale of his holdings.

A stockholder, in selling his stock to a stranger, is not a trustee for other stockholders. This would seem to be so though a stockholder sold a majority of the stock.

In *Gamble* v. *Queens County Water Co.* (123 N. Y. 91) it was held that a stockholder in voting his stock is in no sense a trustee or representative of other stockholders. Corporate stock, it was said, might be voted in the light of what the owner considers his own interest. The court said that it is only where the stockholder's interest is detrimental to the interests of the corporation and the action taken is a wanton and fraudulent destruction of the rights of the minority that the stockholder may be held to account. If this is so as to the voting of stock, it would seem to apply with equal, if not greater force to a sale of stock. By analogy, only a wanton and fraudulent destruction of the rights of the minority would seem to be actionable in the present situation. But even if we assume that the more rigid requirements of good faith or reasonable care are applicable, we find no breach of these requirements here.

Persons holding a majority of the stock of a corporation have the right and power to control the corporation within the limits of its charter powers. A sale of such controlling interest, of itself, perpetrates no wrong on anyone. (*Barnes* v. *Brown*, 80 N. Y. 527, 537.)

Stockholders are not *ipso facto* trustees for each other (*Blaustein* v. *Pan American Petroleum & Transport Co.*, 263 App. Div. 97, at p. 119; *Gamble* v. *Queens County Water Co., supra; Bell* v. *Ley & Co., Inc.*, 278 Mass. 60, 75.).

A majority stockholder does not become a fiduciary for other stockholders by reason merely of ownership of his stock. It is only where he steps out of his role as a stockholder, and acts in the management and conduct of the corporation, with disregard of the interests of the corporation and of the minority stockholders that he is said actually to become a fiduciary instead of a mere stockholder. (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *Blaustein* v. *Pan American & Transport Co., supra.*) We may assume that he may be held as fiduciary when he is in active charge of corporate affairs, and induces a minority stockholder to sell his holdings, concealing the true condition of corporate finances for the purpose of making a personal

profit. (See *Sautter* v. *Fulmer*, 258 N. Y. 107.) Such a state of facts would not be analogous to the present one.

The New York cases relied on by the trial court in its opinion, as supporting its holding there, would seem to have no application, for the reason that they involved the improper conduct of corporate affairs by those controlling a majority of the stock.

In *Farmers' L. & T. Co.* v. *N. Y. & N. R. Co.* (150 N. Y. 410), the majority stockholder (another corporation) actually took over the management of the subsidiary, and diverted income from it, refusing business which would have been sufficient to pay interest on its obligations. Having thus permitted a default in interest, the majority stockholder instituted an action to foreclose, so as to obtain the property at less than its true value.

*Bosworth* v. *Allen* (168 N. Y. 157) involved misconduct by directors, and presented the question of their liability in such capacity.

In *Kavanaugh* v. *Kavanaugh Knitting Co. (supra)*, a dissolution of a prosperous corporation was involved at the instance of the majority stockholders. The court held that the determination of the question whether the dissolution was wise was part of the corporate affairs, and the majority stockholders occupied a position of trust to the corporation, and were burdened with fiduciary obligations in making such decision. It was only in taking corporate action as to dissolution that the stockholders were held to be acting for each other, and thus prevented from acting for their individual advantage. In that case the Court of Appeals stated (at p. 194): "Undoubtedly no trust relation ordinarily exists between the stockholders themselves."

In the present case no claim was made that any of the affairs of American Beverage Corporation were mismanaged by appellants; nor was it claimed that the conduct of corporate affairs was directly involved in the sale of the stock.

The trial court relied largely on the decision in *Insuranshares Corporation* v. *Northern Fiscal Corp.* (35 Fed. Supp. 22). We think the case referred to is distinguishable upon the facts. There the sale of corporate control involved the transfer of the stock of an investment trust, the assets of which consisted entirely of readily saleable securities. Plenary power to sell the assets went with control. In the present case the company is a going mercantile concern, possessing plant, equipment, trademarks, good will, et cetera. In the *Insuranshares* case (*supra*) the transferors received a price beyond the intrinsic, or book value of their shares, which were capable of accurate measurement by consideration of the market value of the secur-

ities owned by the investment trust. Here the contrary appears. The controlling stockholders there agreed to convert part of the company's assets into cash before delivering control, and to secure the resignation of directors. No such agreements existed here. In addition, in the cited case the transferors were cognizant of the fact that a short time before the company had suffered a loss of many millions of dollars through a transfer of control to dishonest persons, and it was shown that the danger of a recurrence of this situation had been specifically called to the transferors' attention.

The present case does involve a charge that the majority stockholders benefited at the expense of the minority. That charge, however, rests solely on the claim that more was received by appellants for their stock than it was bringing in the open market. The difference between market price and liquidating value would indicate that the market price of small lots of stock did not reflect its intrinsic worth, especially of controlling stock. Realization of more than the market price would not, under such circumstances, be indicative of fraud, nor afford the minority stockholders any right of action. Nor would the fact that purchasers were willing to pay a larger price to one holding control necessarily make the receipt of an increased price improper or indicate any unlawful intention on the part of the purchasers. Control might have lawful advantages. For instance, if corporate control for the purpose of merger, or some similar object, was desired by the purchasers for legitimate purposes, undoubtedly they would pay more for a controlling interest. We see no reason why the value of control would not be a lawful property right of the controlling stockholders, at least to the extent that it is reflected in the price they may obtain for their stock in an honest sale. In any event, in view of the liquidation value of the stock involved in the present case, the sum realized here could not be said to be so excessive as to indicate any danger signal.

Of course, a majority stockholder may not knowingly use his position to wrongfully injure one who holds a minority interest, and will incur liability when he does so. The test of common honesty would seem to be a sufficient one to apply in order to determine when a wrong is being done. To apply the rigid rules limiting a fiduciary, and to say further that the failure to investigate the moral character, or financial ability of the purchaser of one's stock is an actionable wrong, is to place an unwarranted burden upon the ownership of stock. Knowledge that

the purchasers were about to loot the corporate treasury, or were persons who had previously engaged in such practices would be one thing. Concluding on the basis of mere lack of knowledge concerning the business integrity of the purchaser that the seller assumes the risk that the buyer has an intention to loot the company would be quite another. The law does not require one to act on the assumption that a person with whom a business transaction, even of large amount, is had, will commit a fraudulent or criminal act if given the opportunity to do so. Quite the contrary may be assumed, in the absence of actual notice.

In the present case there is no evidence that McCullough had any intimation that Feinberg was a man of bad repute. In fact, that Feinberg was such a person is not claimed. The theory of respondents in this case, seems to be that the person from whom Feinberg bought control of Prendergast-Davies Co. Ltd., was a man of such reputation. To say that a circumstance of this remote nature should prevent or deter the sale of one's stock, or create the duty of investigation, seems unwarranted in reason.

As we find no basis in fact or in law for the judgment appealed from, it becomes unnecessary to discuss the question of damages and other points raised.

The judgment so far as appealed from should be reversed with costs, and the complaint dismissed on the merits with costs.

MARTIN, P. J., UNTERMYER, DORE and COHN, JJ., concur.

Judgment, so far as appealed from, unanimously reversed with costs, and the complaint dismissed on the merits with costs. Settle order on notice, reversing the findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.